WO                                                                                           MGD

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

Daryell E. Arnold, Jr.,                                    No.  CV 20-01442-PHX-JAT (JFM)

                Plaintiff,

v.                                                         **ORDER**

State of Arizona, et al.,

                Defendants.

      Plaintiff Daryell E. Arnold, Jr., who is represented by counsel, brought this civil rights action pursuant to 42 U.S.C. § 1983.  Before the Court is Defendants' Motion for Summary Judgment based on failure to exhaust administrative remedies (Doc. 18), which Plaintiff opposes (Doc. 28).  The Court will deny the Motion.

**I.    Background**

      Plaintiff alleges the following in his Amended Complaint.  On March 19, 2019, while Plaintiff was incarcerated in the Arizona State Prison Complex-Lewis, Buckley Unit, he informed Defendant Correctional Officer (CO) II Hernandez that other prisoners had threatened to assault and kill him on sight and that there was a documented hit order out on him by the Aryan Brotherhood in Arizona.  (Doc. 1-3 at 18.)[1]  Hernandez sent Plaintiff to a detention unit.  (*Id.*)  The move was approved by Defendants CO IV Swayne and Assistant Warden Pitz.  (*Id*. at 19.)

_____

     [1] The citation refers to the document and page number generated by the Court's Case Management/Electronic Case Filing system.

On April 8, 2019, Plaintiff was forced to return to Buckley Unit and upon his arrival there, Plaintiff informed Defendant Sergeant Morkowski that prisoners on that yard wanted to kill him. (*Id.*) Morkowski became angry and wrote Plaintiff a ticket for refusing to house and sent Plaintiff to the detention unit. (*Id.*) On April 9, 2019, Plaintiff was interviewed by Defendant SSU Taylor, and when Plaintiff told Taylor other prisoners wanted to kill him, Taylor said he "didn't care" and if Plaintiff did not go back to Buckley, Taylor would "house him in S.D.U. with an enemy." (*Id*. at 20.) Plaintiff returned to the Buckley Unit against his will and when he arrived, the cells were open and prisoners were able to walk freely in the pod. (*Id*. at 21.) Buckley Unit is a close custody yard, and ADC policy only permits 4 prisoners out at a time there, but when Plaintiff arrived, 30 to 40 prisoners were out walking the pod unsupervised. (*Id.*) Defendants former Arizona Department of Corrections (ADC) Director Ryan, Warden Thompson, Pitz, Hernandez, CO II Murphy, Taylor, and Swayne knew about this situation prior to Plaintiff's return to the Buckley Unit. (*Id.*) Within an hour of being back on the Buckley yard, two prisoners entered Plaintiff's cell and assaulted and beat him repeatedly with a lock in a sock; Plaintiff was knocked unconscious for more than five minutes, stomped on, and hit with closed fists. (*Id*. at 21-22.) Plaintiff suffered a concussion, fractured ribs, a severe facial hematoma, contusions over his head and body, lacerations to both ears, and blood loss. (*Id*. at 22.)

On screening under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated Eighth and Fourteenth Amendment failure-to-protect or threat-to safety claims in Count One against Defendants Ryan, Thompson, Pitz, Taylor, Swayne, Hernandez, Murphy, and Morkowski and an Eighth Amendment policy or practice claim in Count Two against Defendants Ryan and Thompson and ordered these Defendants to answer the Complaint. (Doc. 5.) The Court dismissed the State of Arizona. (*Id.*)

**II. Legal Standards**

**A.    Summary Judgment Standard**

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything.  *Nissan Fire & Marine Ins. Co.*, *Ltd. v. Fritz Co.*, *Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000).  But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant.  *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).  The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial.  *Anderson*, 477 U.S. at 249.  In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor.  *Id.* at 255.  The court need consider only the cited materials, but it may consider any other materials in the record.  Fed. R. Civ. P. 56(c)(3).

## B.    Exhaustion

Under the Prison Litigation Reform Act (PLRA), a prisoner must exhaust "available" administrative remedies before filing an action in federal court.  *See* 42 U.S.C. § 1997e(a); *Vaden v. Summerhill*, 449 F.3d 1047, 1050 (9th Cir. 2006); *Brown v. Valoff*, 422 F.3d 926, 934-35 (9th Cir. 2005).  The prisoner must complete the administrative review process in accordance with the applicable rules.  *See Woodford v. Ngo*, 548 U.S.

1   81, 92 (2006).  Exhaustion is required for all suits about prison life, *Porter v. Nussle*, 534

2   U.S. 516, 523 (2002), regardless of the type of relief offered through the administrative

3   process, *Booth v. Churner*, 532 U.S. 731, 741 (2001).

4       The defendant bears the initial burden to show that there was an available

5   administrative remedy and that the prisoner did not exhaust it.  *Albino v. Baca*, 747 F.3d

6   1162, 1169, 1172 (9th Cir. 2014); *see Brown*, 422 F.3d at 936-37 (a defendant must

7   demonstrate that applicable relief remained available in the grievance process).  Once that

8   showing is made, the burden shifts to the prisoner, who must either demonstrate that he, in

9   fact, exhausted administrative remedies or "come forward with evidence showing that there

10  is something in his particular case that made the existing and generally available

11  administrative remedies effectively unavailable to him."  *Albino*, 747 F.3d at 1172.  The

12  ultimate burden, however, rests with the defendant.  *Id.*  Summary judgment is appropriate

13  if the undisputed evidence, viewed in the light most favorable to the prisoner, shows a

14  failure to exhaust.  *Id.* at 1166, 1168; *see* Fed. R. Civ. P. 56(a).

15      The Ninth Circuit has recognized various instances where a prisoner is excused from

16  the exhaustion requirement because administrative remedies were rendered unavailable,

17  including where officials improperly screen a prisoner's grievance or where the prisoner

18  does not have access to the proper forms.  *See, e.g., Sapp v. Kimbrell,* 623 F.3d 813, 823

19  (9th Cir. 2010) ("improper screening of a prisoner's administrative grievances renders

20  administrative remedies 'effectively unavailable' such that exhaustion is not required under

21  the PLRA"); *Marella v. Terhune*, 568 F.3d 1024, 1027-28 (9th Cir. 2009) (per curiam)

22  (remedies are unavailable where the prisoner does not have access to the necessary

23  grievance forms); *Nunez v. Duncan*, 591 F.3d 1217, 1224 (9th Cir. 2010) (finding

24  plaintiff's failure to exhaust was excused because he "was precluded from exhausting, not

25  through his own fault but by the Warden's mistake").  In addition, the Supreme Court has

26  held that proper exhaustion may not be required when "prison administrators thwart

27  inmates from taking advantage of a grievance process through machination,

28

1    misrepresentation, or intimidation." *Ross v. Blake*, __ U.S. __, 136 S. Ct. 1850, 1860

2    (2016).

3    **III.    Relevant Facts**

4        **A.    ADC Grievance Process**

5        Department Order 802 (DO 802), Inmate Grievance Procedure, with an effective

6    date of October 16, 2016, governs the ADC's inmate grievance procedure and is the version

7    that was in effect at all times relevant to this lawsuit.  (Doc. 19 (Defs.' Statement of Facts)

8    ¶ 2.)  DO 802 sets forth the procedures that prisoners must follow to complete the prison

9    administrative grievance process through the Director's level, which is the final step of the

10   administrative grievance process for non-medical grievances.  (*Id.* ¶ 3.)  A written copy of

11   the Inmate Grievance Procedure is available to prisoners at each prison unit's Inmate

12   Resource Library.  (*Id.* ¶ 5.)  Prisoners also receive a written and oral explanation of the

13   Inmate Grievance Procedure during intake and as part of the orientation process when they

14   transfer to a new facility.  (*Id.*)

15       The Inmate Grievance Procedure for non-medical grievances is a four-step review

16   process for prisoners to seek resolution of issues they encounter while incarcerated.  (Doc.

17   19 ¶ 7.)  The first step requires prisoners to attempt to resolve their complaints through

18   informal means by discussing the issue with staff in the area most responsible for the

19   complaint.  (*Id.* ¶ 8.)  If the prisoner is unable to resolve the complaint through informal

20   means, the second step is to submit an Informal Complaint on an Informal Complaint

21   Resolution Form 802-11 to the CO III.  (*Id.* ¶ 9.)  The CO III will informally investigate

22   and attempt to resolve the issue raised in the Informal Complaint Resolution form and

23   provide the prisoner with a written response within 15 workdays.  (*Id.* ¶ 10.)

24       If the prisoner is dissatisfied with the Informal Complaint Response or if the time

25   frames for the CO III to provide a response have been exceeded, the third step is for the

26   prisoner to submit a Formal Grievance (using the Inmate Grievance Form 802-1 and/or the

27   Inmate Grievance-GF Supplement Form 802-7) to the unit CO IV Grievance Coordinator

28   who will log the Formal Grievance and investigate the issue.  (*Id.* ¶ 11.)  A grievance will

be rejected and returned to the prisoner as unprocessed if it includes multiple unrelated issues or is a "duplicate complaint."" (*Id.* ¶ 12.) Within 15 working days following receipt of the formal grievance, the Deputy Warden will issue a written response to the prisoner that includes the Deputy Warden's decision and supporting rationale. (*Id.* ¶ 14.)

The fourth and final step is for the prisoner to appeal the decision of the Deputy Warden to the Director by submitting an Inmate Grievance Appeal Form 802-3 to the unit CO IV Grievance Coordinator. (*Id.* ¶ 15.) Prisoners may not submit an appeal to the Director until the first three steps of the Inmate Grievance Procedure described above have been exhausted. (*Id.*) The unit CO IV Grievance Coordinator will log, process, and forward the Inmate Grievance Appeal documents to the Central Office Appeals Officer within 5 workdays of receiving the appeal from the prisoner. (*Id.* ¶ 16.) Within 30 calendar days of receipt of the Inmate Grievance Appeal, the Central Office Grievance Appeals Officer shall prepare a response and submit it to the Director for approval and signature. (*Id.* ¶ 17.) The Director's decision is final, and ADC considers the Director's decision to constitute exhaustion of all remedies. (*Id.* ¶ 18.)

**B.** **Plaintiff's Grievances**

Following the April 9, 2019 assault at the Buckley Unit, Plaintiff was housed at the Morey Unit from April 9 through July 20, 2019. (Doc. 19 ¶ 25.) Tom Staab was the CO III assigned to Plaintiff while he was at Morey Unit in 2019, and Morey Unit prisoners could obtain all grievance forms at the CO III office Monday through Friday from 8 a.m. to 4 p.m. or when the CO III performed a weekly "pod walk" in the unit. (*Id.* ¶¶ 26, 29.) It is Staab's practice to immediately provide grievance forms to prisoners who request them, and if Plaintiff had requested grievance paperwork from Staab, he would have promptly provided it. (*Id.* ¶¶ 30, 32.) Staab recalls that Plaintiff requested grievance paperwork regarding an incident at Buckley Unit that took place in April 2019, and Staab provided the paperwork the same day.[2] (*Id*. ¶ 33.)

---

[2] Staab does not provide a date for when he gave Plaintiff the grievance paperwork.

Plaintiff disputes the facts about Staab's practice regarding grievance forms, asserting that he first asked Staab for grievance materials on either April 9 or 10, 2021, but Staab told Plaintiff the April 9, 2019 assault was under investigation and that Plaintiff should "wait until the investigation was over" before filing a grievance. (Pl. Supp. Decl. ¶ 1 (Doc. 29-1 at 12).) On May 22, 2019, Staab came to Plaintiff's cell front and advised Plaintiff that he "could now file an informal grievance form," but Staab did not have any forms on him and said he "would supply one through other means," which Plaintiff interpreted to mean Staab would have another CO deliver the forms to Plaintiff. (*Id.* ¶ 2.) Staab did not provide the forms, and Plaintiff asked other officers to advise Staab that he never received the grievance forms as promised and that Plaintiff "was concerned about [his] time frames to file a grievance." (*Id.* ¶ 4.) On May 24, 2019, Staab came to Plaintiff's cell and said Plaintiff "would be granted a fifteen (15) business day extension from May 24, 2019 to gather facts regarding the April 9, 2019 assault." (*Id.* ¶¶ 5, 7.) Staab also explained that at the conclusion of the 15-day extension, Plaintiff would have 10 days to file an informal complaint, which gave Plaintiff until June 28, 2019. (*Id.* ¶¶ 6, 7.)

On June 27, 2019, Plaintiff submitted an Informal Complaint Resolution to CO III Staab describing the events leading up to the assault on April 9, 2019, including his advising various Defendants that his life was in danger and being pressured into returning to Buckley Unit. (Doc. 19-1 at 3.) Plaintiff wrote about the assault and that the prisoners who assaulted him stole all his property. (*Id.*) On July 4, 2019, Staab responded to Plaintiff's Informal Complaint, stating:

> I cannot speculate as to why you have had these recent events happen to you. But, none of these things you have written in your Informal Complaint happened to you while in MDU [Morey Detention Unit]. I am responsible for what happens in MDU not on all these other yards and with all these other staff. As far as moving you to the same location where you were assaulted only hours from your arrival and your property stolen by inmates on April 9, 2019. It is now July 3, 2019 you are out of time frames for a grievance on your property. I am unable to resolve your issue. You may proceed to the next step of the Grievance Process which is to file a Formal Grievance.

1   (*Id*. at 4.)

2          On July 9, 2019, Plaintiff submitted a formal Inmate Grievance, with a copy of his

3   Informal Complaint attached, about the events leading up to the April 9, 2019 assault on

4   him by three prisoners, his injuries, and his eventual transfer to the Morey Detention Unit.

5   (*Id*. at 5-7.)  The last sentence of Plaintiff's three-page Inmate Grievance states "And, all

6   my property was stolen by these inmates."  (*Id*.)  Plaintiff gave the Inmate Grievance to

7   Staab who gave it to CO IV Chavez, the grievance coordinator at the time.  (Doc. 19 ¶ 38.)

8   Neither Staab nor the Warden responded to Plaintiff's Inmate Grievance, and the Inmate

9   Grievance was not returned to Plaintiff as unprocessed.  (Doc. 29 ¶ 39.)

10         CO IV Yvette Minino, who works at the Morey Unit, reviewed the Morey Unit

11  Grievance Log for all processed and unprocessed Grievances and Grievance Appeals

12  submitted by Plaintiff between March 22, 2019 and July 20, 2019, and the log shows

13  Plaintiff did not submit any processed Grievances or Grievance Appeals during that period,

14  but the "log does show an unprocessed Grievance filed July 2019."  (Minino Decl. ¶¶ 5-9

15  (Doc. 19-1 at 43).)   Minino asserts that under the time frames set forth in DO 802,

16  Plaintiff's last possible day to timely file a grievance regarding the April 9, 2019 assault

17  was May 29, 2019, and that the "Inmate Grievance received July 9, 2019" does not comply

18  with DO 802 "as it was not filed within valid timeframe and includes multiple issues.

19  Therefore, it would not have been processed."  (*Id.* ¶¶ 11-13.)  Plaintiff disputes these

20  assertions, noting that the Morey Unit Grievance Log is not accurate because it does not

21  reflect his June 27, 2019 Informal Complaint.  (Doc. 29 ¶¶ 40-41, 43.)  Plaintiff also

22  disputes that May 29, 2019 was the last day for him to file a formal grievance about the

23  April 9, 2019 assault because it is not clear how that deadline was calculated and because

24  CO III Staab continued the deadlines on May 22, 2019.  (*Id.* ¶ 34.)

25         From July 20, 2019 to June 12, 2020, Plaintiff was housed at the Rast Unit.  (Doc.

26  19 ¶ 48.)  According to CO IV Jonathan Cameron, Plaintiff did not submit any processed

27  Grievances or Grievance Appeals between July 1, 2019 through June 30, 2020, but Plaintiff

28

did submit three unprocessed Grievances dated October 1, 2019, March 14, 2020, and May 28, 2020.[3]  (Cameron Decl. ¶¶ 9-10 (Doc. 19-1 at 54).)

Plaintiff asserts that while he was at the Rast Unit, he spoke with CO IV Cameron about his "prior grievances and was told they could not accept his grievance appeal due to no[t] being issued a grievance number."  (Doc. 29 ¶ 56; Pl. Decl. ¶ 12 (Doc. 29-1 at 6).)  The next time Plaintiff spoke to CO IV Cameron, Plaintiff was told that Cameron was no longer in charge of grievances at Rast Max Unit.  (Pl. Decl. ¶ 13.)  Plaintiff waited to receive a grievance number, but it never came.  (*Id*.)  On September 17, 2019, Plaintiff explained the situation to CO III Daniels and that he was not able to file an appeal because he was not issued a grievance number.  (*Id.* ¶ 14.)  Daniels told Plaintiff to complete the appeal paperwork and Daniels would submit it to the Grievance Coordinator at Rast Max.  (*Id*.)  Plaintiff submitted an Inmate Grievance Appeal to CO III Daniels on September 17, 2019.  (*Id*.)

Plaintiff's Inmate Grievance Appeal dated September 17, 2019 is addressed to "Grievance Coordinator, Warden, Deputy Warden or Administrator" and asserts that Plaintiff did not receive a timely response to his Grievance filed in July 2019 with CO III Staab at the Morey Detention Unit and he has been unable to get the paperwork and forms to exhaust his internal remedies.  (Doc. 19-1 at 12.)  Plaintiff recounted the events leading up to the assault by three prisoners on April 9, 2019 in the Buckley Unit and the injuries he sustained from the assault.  (*Id*. at 12-14.)  The Grievance Appeal indicates that it was received by CO III Daniels, Badge # 6875.  (*See id*. at 12.)

Plaintiff submitted another Inmate Grievance Appeal dated December 5, 2019, which is addressed to "Director Level-Central Office ADOC" and states that the "time frames are changed because the administration has failed to properly respond to my attempt to exhaust internal remedies" and "Lewis admin did not respond to grievance or issue a #."  (Doc. 19-1 at 19.)  Plaintiff wrote in this appeal about the failure of ADC employees to

---

[3] These unprocessed Grievances do not appear to relate to the April 9, 2019 assault.

1    keep him safe "after being advised of a very serious problem." (*Id.*)  The appeal indicates

2    it was received by CO II Mejia.  (*Id.*)

3          Defendants have no record of the September 17, 2019 or the December 5, 2019

4    Inmate Grievance Appeals that Plaintiff purportedly submitted at the Rast Unit, and even

5    if Plaintiff did submit those documents, they "would have been unprocessed and rejected

6    because they raise[] multiple unrelated issues on a single form, and fell outside of the time

7    frame to grieve the events related to the April 9, 2019 assault."  (Doc. 19 ¶¶ 56-61.)  ADC

8    Central Office has no record of Plaintiff filing an Inmate Grievance Appeal at any time

9    from November 2018 through the present.  (*Id.* ¶¶ 61, 65.)

10   **IV.    Discussion**

11         Defendants argue that Plaintiff had until May 29, 2019 to file an Inmate Grievance

12   regarding the April 9, 2019 assault, and therefore Plaintiff's June 27, 2019 Informal

13   Complaint to CO III Staab was untimely, which CO III Staab noted in his response.  (Doc.

14   18 at 8.)  Plaintiff, though, presents evidence that he timely asked Staab for grievance forms

15   on April 9 or 10, 2019, but Staab told him the assault was under investigation and that

16   Plaintiff should "wait until the investigation was over" before filing a grievance.  (Pl. Supp.

17   Decl. ¶ 1 (Doc. 29-1 at 12).)  On May 22, 2019, Staab told Plaintiff that he "could now file

18   an informal grievance form," but Staab did not have any forms on him and would supply

19   them later.  (*Id.* ¶ 2.)  When Staab did not deliver the forms, Plaintiff asked other officers

20   to tell Staab he needed the forms.  (*Id.*)  On May 24, 2019, Staab told Plaintiff he "would

21   be granted a fifteen (15) business day extension from May 24, 2019 to gather facts

22   regarding the April 9, 2019 assault," and at the conclusion of the 15-day extension, Plaintiff

23   would have 10 days to file an informal grievance, or until June 28, 2019.  (*Id.* ¶¶ 5-7.)

24         Defendants argue that Plaintiff's only evidence that he was given two extensions of

25   time by CO III Staab to file an Informal Complaint is "his own, self-serving affidavit," and

26   that DO 802 does not provide for extensions of time for prisoners to complete the grievance

27   process.  (Doc. 30 at 2-3.)  "That an affidavit is self-serving bears on its credibility, not on

28   its cognizability for purposes of establishing a genuine issue of material fact."  *United*

1    *States v. Shumway*, 199 F.3d 1093, 1104 (9th Cir. 1999).  At summary judgment, the Court

2    does not make credibility determinations.  *See Soremekun v. Thrifty Payless, Inc*., 509 F.3d

3    978, 984 (9th Cir. 2007).  Plaintiff's two Declarations are signed under penalty of perjury,

4    and he has personal knowledge to testify to what CO III Staab told him.  *See* Fed. R. Civ.

5    P. 56(c)(4); *S. Cal. Housing Rights Ctr.*, 426 F. Supp. 2d at 1070.  Moreover, Defendants

6    have not presented any evidence, such as a supplemental declaration from Staab, denying

7    that Staab gave Plaintiff the extensions.  *See Albino*, 747 F.3d at 1172 (noting that the

8    ultimate burden of proof rests with the defendant).  Thus, Plaintiff's declaration statements

9    about the extensions are undisputed and are admissible evidence that must be considered.

10        As to Defendants' argument that Staab informed Plaintiff in his response that the

11   Informal Complaint was untimely, Staab's response actually states, "[a]s far as moving you

12   to the same location where you were assaulted only hours from your arrival and your

13   property stolen by inmates on April 9, 2019.  It is now July 3, 2019 you are out of time

14   frames for a grievance on your property." (Doc. 19-1 at 4.)  Staab did not say that Plaintiff

15   was out of timeframes for a grievance on the assault, and Staab went on to say that he was

16   "unable to resolve" Plaintiff's issue and that Plaintiff "may proceed to the next step of the

17   Grievance Process which is to file a Formal Grievance."  (*Id*.)  Staab did not return the

18   Informal Complaint as unprocessed because it was untimely, and Staab did not say the

19   Informal Complaint was rejected because it focused on more than one issue.   Also,

20   Defendants do not say why Staab would inform Plaintiff that he may proceed to the next

21   step of the Grievance Process if Plaintiff's Informal Complaint failed to meet the

22   requirements of DO 802 and was returned unprocessed.  Staab's after-the-fact statements

23   in his Declaration that the Informal Complaint "would fail" because it was untimely and

24   focused on more than one issue do not change this analysis.  (Doc. 19-1 at 47 ¶ 12.)  Staab

25   did not inform Plaintiff in his Response that the Informal Complaint focused on more than

26   one issue, and Staab's speculative assertions about why the Informal Complaint might fail

27   are not competent evidence and are unsupported by his response to Plaintiff's Informal

28

1   Complaint.  *See Soremekun* 509 F.3d at 984 ("Conclusory, speculative testimony in
2   affidavits and moving papers is insufficient to raise genuine issues of fact.").

3          Also, Defendants do not point to where DO 802 says an informal complaint cannot
4   encompass more than one issue, and DO 802 § 3.3 concerning formal grievances states that
5   "The inmate shall place a single complaint with related issues on a single Inmate Grievance
6   form.  If the inmate includes multiple unrelated issues on a single form or submits a
7   duplicate complaint, the submission of the grievance shall be rejected and returned to the
8   inmate as unprocessed."  (Doc. 19-1 at 31.)  If that is the provision Defendants rely on for
9   saying Plaintiff's Informal Complaint addressed multiple issues, it is not clear from the
10  language in DO 802 that Plaintiff could not complain both about the assault and the same
11  prisoners who assaulted him taking his property at the time of the assault.  Because DO
12  802 says a prisoner may submit a complaint with related issues on a single form, an assault
13  accompanied by a robbery by the same perpetrators at the same time would appear to be
14  related issues, and an informal complaint about those two related issues appears to comply
15  with DO 802 § 3.3.  *See, e.g., Ross*, 136 S. Ct. at 1859-60 (an administrative procedure
16  may be deemed unavailable within the meaning of the PLRA when the procedure is "so
17  opaque that it becomes, practically speaking, incapable of use").

18         Defendants also argue that DO 802 does not provide prisoners with extensions of
19  time to complete the grievance process.  (Doc. 30 at 2.)  Defendants cite to various
20  provisions in DO 802 that discuss extensions of time for staff investigations and staff
21  responses, and they argue that Plaintiff misreads the "plain language" of DO 802 § 1.10,
22  which states, "Unless notified of an extension of time frames, expiration of any time limit
23  for a response at any stage in the process shall entitle the inmate grievant to move to the
24  next step in the process."  (*Id*.)  Contrary to Defendants' assertion, the language of that
25  particular section is not so plain that a prisoner would know that extensions of time for
26  prisoners are not permitted at all, especially in light of Plaintiff's undisputed evidence that
27  he was given extensions of time frames.  As to the Inmate Grievance Plaintiff submitted to
28  Staab on July 9, 2019, Defendants argue that it "was rejected and returned to Plaintiff

unprocessed because it was not filed within the required timeframe and raised multiple, unrelated issues." (Doc. 18 at 8.)  Defendants evidence, though, only says the Morey Unit grievance log shows an unprocessed grievance filed in July 2019, and that the Inmate Grievance Plaintiff provided dated July 9, 2019 "did not comply with Department Order 802 because it was not filed within the required timeframe and raises multiple issues.  It would have been rejected and returned to Plaintiff unprocessed." (Minino Decl. ¶¶ 9, 12-13 (Doc. 19-1 at 43).)  The testimony about what would have happened is speculative and therefore unpersuasive.  Also, it is not entirely clear that the "July 2019" unprocessed grievance referenced in the grievance log is even Plaintiff's July 9, 2019 Inmate Grievance, and Defendants present no evidence that the Inmate Grievance was ever returned to Plaintiff unprocessed.  Moreover, Plaintiff presents evidence that he never received a response to his July 9, 2019 Inmate Grievance, even one that informed him his Inmate Grievance was untimely, unprocessed, or raised multiple issues, and he did not receive a grievance number, which he was told prevented him from filing a grievance appeal.  (Doc. 29-1 at 14 ¶¶ 15-16.)

As to Plaintiff's Grievance Appeals, Defendants argue that even if Plaintiff's evidence about the extensions from CO III Staab is believed, Plaintiff failed to exhaust his administrative remedies because he did not file an appeal with the Director.  (Doc. 30 at 3.)  Defendants argue that courts interpreting DO 802 have held that prisoners "must file a Grievance Appeal, even if they do not receive a Formal Grievance Reply." (*Id*. at 4, citing two district court cases from Arizona and Nevada.)  While the Arizona district court case cited by Defendants did find that the plaintiff was obligated to file an appeal to the Warden/Deputy Warden when the time for responding to the inmate grievance had expired, the court further found that the plaintiff did not attempt to file an appeal after receiving no response to his grievance. *Anderson v. Schriro*, No. CV 09-0609-PHX-JWS (MEA), 2010 WL 11538522, at *4 (D. Ariz. June 24, 2010)).

Unlike the plaintiff in *Anderson*, Plaintiff here avers that he did attempt to file an appeal, but CO IV Cameron told him "they wouldn't accept his grievance appeal due to

not being issued a grievance number." (Doc. 29-1 at 6 ¶ 12.) Plaintiff nevertheless "proceeded to submit on multiple occasions a Grievance Appeal which would only be returned to [Plaintiff] with no reasons given other than 'they could not process without a grievance number and being that the complain[t] mentioned happened on a different unit." (*Id.* ¶ 13.) Plaintiff states that he was finally able to explain the situation to CO III Daniels on September 17, 2019, and Daniels told Plaintiff to complete the appeal paperwork and Daniels would submit it to the Grievance Coordinator at Rast Max. (*Id.* ¶ 14.) Plaintiff submitted an Inmate Grievance Appeal to CO III Daniels that same day about the April 9, 2019 assault; that Grievance Appeal was addressed to "Grievance Coordinator, Warden, Deputy Warden or Administrator," and the Grievance Appeal indicates that it was received by CO III Daniels, Badge # 6875. (Doc. 19-1 at 12-14.) Plaintiff does not say he did not receive a response to this appeal, but drawing all inferences in his favor, he did not, and he proceeded to file an Inmate Grievance Appeal dated December 5, 2019 addressed to "Director Level-Central Office ADOC." (*Id.* at 19.) Defendants do not present any evidence, such as a supplemental declaration from CO IV Cameron, denying that Cameron told Plaintiff he could not file an appeal without a grievance number, and there is no evidence, such as a supplemental declaration from CO III Daniels, denying that he told Plaintiff he could file his grievance appeal on September 17, 2019. Thus, Plaintiff's evidence is undisputed.

Because Defendants have failed to carry their ultimate burden, the Court will deny their Motion for Summary Judgment.

**IT IS ORDERED** that the reference to the Magistrate Judge is **withdrawn** as to Defendants' Motion for Summary Judgment (Doc. 18), and the Motion is **denied**.

Dated this 9th day of June, 2021.

James A. Teilborg
Senior United States District Judge